[Cite as *Dunn v. Ransom*, 2011-Ohio-4253.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PIKE COUNTY

Thelma Dunn, et al.,                    :

    Plaintiffs-Appellees,               :            Case No. 10CA806

    v.                                  :

George H. Ransom, et al.,               :            <u>DECISION AND JUDGMENT ENTRY</u>

    Defendants-Appellants.              :            **RELEASED 08/18/11**

_____
<u>APPEARANCES</u>:

William S. Cole, Jackson, Ohio, for Appellants.

Jennifer L. Routte and Richard M. Lewis, The Law Firm of Richard M. Lewis, LLC, Jackson, Ohio, for Appellees.
_____
Harsha, P.J.

{¶1}    Nathan and Michelle Maynard, Betty M. Williams, Trustee of the Williams Family Trust, and Richard Beekman appeal from the decision finding implied and prescriptive easements over an access road running through their lands and leading to the property of Thelma Dunn, David Wyckoff, Gary Wyckoff, and Nancy Gragg ("the Wyckoffs").  The Wyckoffs own rural, wooded land connected to a public road by means of a partially improved private road known as "Spoon River Road" (SRR).  SRR, which at times is little more than a dirt path, has been in existence for close to a century and has been the main route of ingress and egress for the Wyckoffs, their predecessors in interest, and others who visited or lived on the property.

{¶2}    In 2001, defendant George Ransom (later replaced as a party in interest by the Maynards) became upset about four-wheeler traffic on SRR, so he erected a barricade, which prevented the Wyckoffs from accessing their land.  The Wyckoffs then

filed suit, asking the court to find that they possessed easements implied from prior use or by necessity and by prescription over the various defendants' lands. They also sued for an injunction preventing the defendants from interfering with these claimed easements. After a bench trial, the court issued a judgment entry in favor of the Wyckoffs, finding an easement implied from prior use through the lands of the Maynards and the Williams Trust. The court also found the Wyckoffs proved an easement by prescription through Richard Beekman's land. Therefore, the court issued an injunction preventing the defendants from interfering with the Wyckoffs' easement rights.

{¶3}    The appellants first contend that the Wyckoffs failed to establish an easement implied from prior existing use over the Maynards and Williams Trust tracts. However, the record contains some competent and credible evidence establishing: (1) that the Wyckoffs' land and the Williams' and Maynards' lands were at one time held in common ownership and later severed into dominant and servient estates; (2) that SRR served as a permanent, continuous, and apparent access road prior to severance; (3) that SRR was a reasonably necessary route of ingress and egress to the claimed dominant portion prior to severance; and (4) that the use of SRR prior to severance was continuous, as opposed to occasional. Consequently, the weight of the evidence supports the imposition of an implied easement.

{¶4}    Next, the defendants contend that the Wyckoffs failed to establish the elements of a prescriptive easement for the use of the portion of SRR crossing Richard Beekman's property. However, the record supports the trial court's finding of an easement by prescriptive use because it contains some competent and credible evidence establishing that the Wyckoffs and their predecessors in interest continuously, openly, and adversely used that portion of SRR for the requisite 21-year period.

**{¶5}** Finally, the defendants contend that the trial court erred by failing to define the nature of the easements it granted.  We agree.  The trial court's written decision awarding the Wyckoffs easements over SRR and its injunction preventing the defendants from interfering with the Wyckoffs' easements rights failed to define the nature, width, or usage rights associated with these easements.  Lacking this specificity, neither the Wyckoffs nor the defendants would be on notice of what constituted an appropriate use of the easements or what might constitute interference.  Therefore, we remand this case for the limited purposes of specifically defining the easements granted and the rights attendant to those easements.

## I.  Summary of the Facts

**{¶6}** This dispute concerns a plot of wooded land located in Sunfish Township in Pike County, Ohio.  The land is north of the intersection of Chenoweth Fork Road and Rob Beekman Hill Road.  A private dirt and gravel road, commonly known as Spoon River Road, connects to Rob Beekman Hill Road, and travels from it in a northwesterly direction, first passing through the property of defendant Richard Beekman.  It next travels across the property of John and Gertrude Beekman, who were originally defendants.  But soon after the Wyckoffs filed suit, John and Gertrude Beekman granted the Wyckoffs an easement to cross the portion of SRR on their property.  The Wyckoffs then dismissed them from the lawsuit.  Continuing on, SRR crosses into the property originally owned by the Ransoms but now owned by the Maynards.  Next, SRR crosses the land owned by the Williams Trust.  Finally, SRR enters into the land owned by the Wyckoffs.

**{¶7}** The Wyckoffs describe the land they own as "Spoon River Hollow" or "the hollow."  It consists, roughly, of six irregularly shaped tracts of land, comprising

approximately 136 acres. SRR runs through a small area of land where a few of the tracts intersect. The plaintiffs, brothers and sisters, acquired the property in 1991. Previously, their parents, Charles and Etta Wyckoff, acquired it in 1957. Charles died in 1987 and Etta acquired full title by survivorship. In 1991, Etta deeded the property to the Wyckoffs while she retained a life estate. Then in 1999 Etta transferred all her interest in fee simple to them.

{¶8}   At trial, the Wyckoffs explained that they, their family and friends, would visit the hollow for recreation purposes, usually when the family would get together at a nearby family residence. They would walk, ride horses, drive cars or four-wheeler ATVs on SRR to access the hollow. Various members of the extended Wyckoff family used the hollow for hunting, to ride four-wheeler ATVs, and other recreational activities.

{¶9}   These activities, which occurred a couple of times per year per family member, took place in the Wyckoff family as far back as when Charles and Etta acquired the property. In 1988, the Wyckoffs contracted a logger to remove timber from the hollow. The logger, Rick Wooldridge, used SRR to access the hollow and remove the timber.

{¶10}  The Wyckoffs always used SRR to access the hollow. However, the hollow is not "landlocked." One portion of the land fronts on Rob Beekman Hill Road. But various parties at trial testified that this portion is at the top of a very steep hill. Going down this hill from the road, one would encounter slope grades ranging from 20% to 35%, which means for every 100 feet traveled on the hill, one would also travel 20 to 35 feet vertically.

{¶11}  In 2001, George Ransom constructed a blockade over the portion of SRR that crosses his property, preventing the Wyckoffs and their family members from

accessing the hollow via that route.  He explained at trial that he was concerned with

four-wheelers trespassing on his property and about possible damage from future

timbering operations.  He also explained that he graveled and built the road using his

own money and the Wyckoffs did not contribute to building or maintaining the portion of

SRR crossing his property.

{¶12}  The Wyckoffs filed suit, asserting a claim for an easement by implication

or necessity.  They asserted that a Calvin Williams held their property, the Williams

Trust tract, and the Ransom/Maynard tract in common ownership.  They also asserted

that when Calvin Williams severed ownership in these commonly held lands, he failed to

record an easement for access to the northern dominant portion.  Thus, they argued an

easement by implication or necessity arose by operation of law in that portion of SRR.

{¶13}  The Wyckoffs also asserted a claim for an easement by prescription.

They contended that they and their parents had used the portion of SRR crossing

Richard Beekman's property adversely for greater than 21 years prior to the Ransom

blockade.  The Wyckoffs additionally sought an order for injunctive relief, i.e., enjoining

the defendants from interfering with their right to use SRR to access the hollow.

A.  The Wyckoffs' Case

{¶14}  At a three-day bench trial, Ed Rhoads,  a real estate attorney who

conducted chain-of-title exams on the relevant properties, testified that a Calvin, or

"C.B. Williams," commonly owned the Wyckoff property, the Maynard property, and the

Williams Trust property.  Rhoads explained that in 1932 Calvin Williams acquired tracts

of property that currently comprise the Maynard and Williams Trust estates.  Then, in

1943, he acquired the tracts currently possessed by the Wyckoffs.  Together, this land

would have formed a generally contiguous whole.  Calvin Williams sold the majority of

this land in 1946, first selling the land now owned by the Maynards and Williams Trust in March 1946 and then selling the land later owned by the Wyckoffs in August 1946. Thus, Rhoads concluded that from approximately 1943 through 1946, Calvin Williams held the land currently owned by the Wyckoffs, Maynards, and Williams Trust in common ownership.

{¶15}  Loren Purdom, a registered surveyor, conducted a survey of the disputed areas in 2002 on behalf of the Wyckoffs.  At trial, he explained a number of USGS and Pike County maps that the Wyckoffs submitted into evidence.  Some of these maps date as far back as the early 20th century.  In some of the USGS aerial maps, portions of SRR not covered by trees are observable to the eye.

{¶16}  Purdom explained that SRR was an access road used for many years. The portion of it traveling through Beekman's and the Maynards' property and connecting with Rob Beekman Hill Road was "improved."  The remainder of SRR, including that on the Wyckoffs' property, was "unimproved."

{¶17}  Purdom testified that the portion of the Wyckoffs' land that abutted Rob Beekman Hill Road was approximately 400 to 500 feet higher than the base of the hollow, where a creek, known locally as "Spoon River," passes through.  Purdom explained that the hillside on the Wyckoffs' land leading up to Rob Beekman Hill Road has slopes ranging from 20% to 35%.  Purdom testified that the maximum slope for a township road in Pike County was 12% to 14%, although he admitted on cross-examination that township slope regulations did not apply to privately built roads. Purdom opined that it would be an "expensive proposition" to create a road with a 12% to 14% grade on the portion of the Wyckoffs' property abutting Rob Beekman Hill Road.

{¶18} The Wyckoffs and various members of their family testified about their use of SRR over their families' decades of ownership of the hollow. Taken together, their testimony demonstrates that they used the hollow consistently but infrequently, for various recreation activities from 1957 through 2001. They would travel SRR openly on foot, car, horse, or four-wheeler ATV. Some members of the family would use it to hunt wildlife or mushrooms. The Wyckoffs' children and grandchildren would ride four-wheeler ATVs on trails located on and around the land. Most of the Wyckoffs and their family members stopped visiting the hollow after Ransom constructed the blockade. However, a few members accessed the land in the years since 2001 by hiking down from Rob Beekman Hill Road.

{¶19} In 1988, the Wyckoffs contracted with Rick Wooldridge to timber the wood in the hollow. Wooldridge testified that before he timbered the area, he asked Robert Williams, John Beekman, and Richard Beekman for permission to drive his trucks over the portion of SRR that crossed their property. After securing permission, and assuring Richard Beekman that he would re-gravel his portion of SRR, Wooldridge set up a mobile sawmill and proceeded with the timbering operation. Wooldridge did not state that the Wyckoffs told him to seek permission before timbering. And no Wyckoff testified that they told him to seek permission.

{¶20} Terry Williams, an employee of the Ohio Valley Electric Corporation, testified that his company had a right-of-way to maintain high voltage power lines that run east west through the Wyckoffs' property. The lines cross Rob Beekman Hill Road where the Wyckoffs' property adjoins that road. Williams testified that SRR was the "easy" way to access the right of way and that it would be difficult, but not impossible, to access the right of way from Rob Beekman Hill Road. Williams said that if necessary,

the company would use bulldozers to create a road for the type of trucks required to maintain the power line.

**{¶21}** Two of the Wyckoffs' witnesses testified about their use of SRR prior to the period of ownership by Charles and Etta Wyckoff. Stanley McNelly, born in 1920, recalled driving up SRR with his father around 1930 to visit an individual who lived in a house located in the hollow. There was also another occupied house located in the hollow. McNelly described SRR as a road that "everybody" used to access the hollow, for hunting and other purposes.

**{¶22}** Cathy Miller testified that she grew up in the hollow and lived in both houses there, beginning in 1943. She moved out around 1950 but would return sometimes as she lived nearby. She recalled seeing Calvin Williams use the road. She was friends with the Wyckoffs and stated that she played with them as a child in the hollow.

**{¶23}** The plaintiffs also submitted into evidence an "affidavit re facts of title" signed and sworn to by John Beekman. In it, Beekman averred that he lived at his current address for the 21-year period prior to the date Ransom erected the blockade on his property. During that time, Beekman stated that the Wyckoffs and their parents, Charles and Etta, used SRR to access their land, and had done so by foot, automobile, and four-wheel ATV. Beekman further averred that he could not recall a period in which he believed that the Wyckoffs or their parents had abandoned their use of the roadway to access their land, or that they had attempted to conceal their use of SRR in any manner. Finally, Beekman stated that he granted the plaintiffs an easement to use the portion of SRR crossing his property in May of 2002.

B. The Defendants' Case

**{¶24}** George Ransom, although no longer a party, testified for the defendants. He stated that he purchased his tract in 1989 from the Williamses. He acquired an easement from both Beekmans and then "built a road" to his property, apparently, turning the portion of SRR on his property from an unimproved condition to an improved condition. He did this by laying a base of heavy rock, then adding limestone, then building culverts. Ransom stated that SRR was not "passable" from the end of Richard Beekman's property to his property until he built the road. Ransom said that he paid for the road improvements himself. He also claimed that he never saw the Wyckoffs cross his property until he erected the barricade. However, he admitted that he saw some four-wheelers "trespass" on his property. Ransom testified that he put the barricade up to stop this traffic.

**{¶25}** Richard Beekman testified that he lived at his current address on SRR, immediately off Rob Beekman Hill Road, for 49 years. He also lived in a different house located 100 feet away from his current residence for fifteen years prior to that. Thus, Richard Beekman had lived on SRR for nearly 65 years as of the trial date. Beekman testified that he never saw Charles, Etta, or Nancy Wyckoff use the road. Later in his testimony on direct, however, Beekman said he saw Charles Wyckoff on SRR riding a three-wheeler, once. Beekman also testified that he saw Thelma Dunn use SRR one time. And he saw David Wyckoff on a four-wheeler three times.

**{¶26}** On cross-examination, Beekman admitted seeing younger people riding four-wheelers on SRR and said that they may have been David Wyckoff's children. The Wyckoffs' attorney also questioned Beekman about inconsistencies in his trial and deposition testimony. First, counsel asked why he stated in his deposition that Wooldridge did not ask him for permission before timbering his land in 1988. Beekman

explained that he meant to say that Wooldridge did not ask him permission prior to going up SRR to set up the timbering operation, but had in fact done so later. Next, counsel asked Beekman if George Ransom paid him $1,000 to help pay for legal expenses in relation to the lawsuit. Beekman denied that the $1,000 was for legal expenses and explained that Ransom gave it to him "out of his heart" and possibly because Beekman's wife was having medical problems. Counsel next read Beekman his deposition testimony, in which he said -- in response to the question "Did you tell David Wyckoff that George Ransom would pay for your legal fees in this case?" – "No, he said he would give me some money on it." In response to this, Beekman claimed he did not recall providing that testimony or that possibly somebody (apparently indicating the court reporter) "made a mistake." Finally, Beekman claimed that his brother John lied in his sworn affidavit.

## C. Judgment

**{¶27}** After the parties submitted post-trial briefs, the court found that the Wyckoffs established an easement by implication over the portion of SRR crossing the Maynards and Williams Trust properties. The court found that the Wyckoffs had not established an easement by necessity, because, although difficult, it would not be impossible for them to access their property via the steep hillside portion of their property bordering Rob Beekman Hill Road. The court further found that the Wyckoffs had proven prescriptive use of the portion of SRR crossing Richard Beekman's property for the 21-year period prior to Ransom's blockade. Finally, the court ordered a permanent injunction preventing the defendants from interfering with the Wyckoffs' easement rights. The court's decision granted the easements but did not expressly

define the width, extent, or nature of the easement.  The defendants filed a timely

appeal.

## II. Assignments of Error

**{¶28}** The defendants submit three assignments of error.

1.  The trial court erred when it found that Plaintiff – Appellees had an implied

easement over the land of Defendant – Appellants Maynard and Williams.

2.  The trial court erred when it found that Plaintiff – Appellees had an easement

by prescription over the land of Appellant – Richard Beekman.

3.  The trial court erred as a matter of law by not defining the easements it found

over the lands of Defendants – Appellants.

## III. The Easements

**{¶29}**  "An easement is an interest in the land of another that entitles the owner

of the easement to a limited use of the land in which the interest exists." *Fitzpatrick v.*

*Palmer*, 186 Ohio App.3d 80, 2009-Ohio-6008, 926 N.E.2d 651, at ¶22.  In this appeal,

we are dealing with "easements appurtenant," which are easements that typically

benefit and/or burden two separate parcels of land, i.e., the dominant tenement (the

land benefited) and the servient tenement (the land encumbered by the easement).

Curry & Durham, Ohio Real Property Law and Practice (6th Ed. 2006), Section 15.01[1],

15-3.  "An easement may be created by specific grant, prescription, or implication that

may arise from the particular set of facts and circumstances."  *Fitzpatrick* at ¶22.

## A. Standard of Review

**{¶30}** The defendants' first two assignments of error challenge the weight of the

evidence supporting the trial court's imposition of implied and prescriptive easements.

Our standard of review on weight of the evidence challenges is deferential to the trial

court.  Although we review the trial record, we must defer to the trial court's judgment if the record contains "some competent, credible evidence" to support it.  See, e.g., *Sec. Pacific Natl. Bank v. Roulette* (1986), 24 Ohio St.3d 17, 20, 492 N.E.2d 438 (per curiam); *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578.  The defendants also set forth some arguments that appear legal in nature, i.e., they assert that some evidence failed to satisfy the applicable legal standard. These issues are subject to de novo review.  See *Pottmeyer v. Douglas*, Washington App. No. 10CA7, 2010-Ohio-5293, at ¶21.

**{¶31}**  In an easement action, the proponent of the easement bears the burden of proving the existence of the easement by clear and convincing evidence. *Trattar v. Rausch* (1950), 154 Ohio St. 286, 292-293, 95 N.E. 685; *Fitzpatrick* at ¶23.  "Clear and convincing evidence" is evidence that will produce in the factfinders mind a firm belief or conviction as to the facts sought to be established.  *Fitzpatrick* at id., citing *State v. Eppinger*, 91 Ohio St.3d 158, 164, 2001-Ohio-247, 743 N.E.2d 881; *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54. "It is considered a higher degree of proof than a mere preponderance of the evidence, the standard generally used in civil cases, but it is less stringent than the 'beyond a reasonable doubt' standard used in criminal trials. The standard of review for weight-of-the-evidence issues, even where the burden of proof is clear and convincing evidence, retains its focus upon the existence of 'some competent, credible evidence.'" Id., citing *Shiebel* at 74.

B.  The Implied Easement over the Maynard and Williams Trust Land

**{¶32}**  In their first assignment of error, the defendants contend that the Wyckoffs' evidence does not satisfy all the elements necessary for imposition of an

easement by implication. They also argue that certain aspects of the trial court's findings do not support an easement implied from prior existing use as a matter of law.

{¶33} Courts may recognize an unrecorded easement, or an easement for which there was no written agreement between the parties, via the theory of an "implied" easement, i.e., an easement implied from prior use. The underlying rationale is "that when one conveys property, she 'includes in the conveyance whatever is necessary for its beneficial use and enjoyment and retains whatever is necessary for the use and enjoyment of the land retained.'" Curry at Section 15.02[3], 15-10, quoting *Trattar* at 291. In other words, a court that implies an easement is merely recognizing what the original property owner, who split up his land, intended to do, i.e., grant an easement in favor of the dominant tenement. Thus, implied easements occur in a division of commonly owned land, i.e., severance of common ownership, a transfer of part of a grantor's land, a simultaneous grant, a partition, a devise, or a judicial sale. Id.

{¶34} The Supreme Court of Ohio has established the following four elements of an easement implied from prior use:

"(1) A severance of the unity of ownership in an estate;

"(2) that, before the separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was meant to be permanent;

"(3) that the easement shall be reasonably necessary to the beneficial enjoyment of the land granted or retained;

"(4) that the servitude shall be continuous as distinguished from a temporary or occasional use only."

*Ciski v. Wentworth* (1930), 122 Ohio St. 487, 172 N.E. 276, at the syllabus.

### 1. Unity of Ownership and Severance

**{¶35}** The defendants contend that the Wyckoffs failed to set forth evidence establishing either unity or severance of ownership by Calvin Williams in the Wyckoff, Williams Trust, and Maynard properties. The element of severance of unity of ownership requires the plaintiff to prove by clear and convincing evidence that the land in question was possessed in common ownership and later severed. See, e.g., *Arkes v. Gregg*, Franklin App. No. 05AP-202, 2005-Ohio-6369, at ¶16. As we explained in *Watson v. Neff*, Jackson App. No. 08CA12, 2009-Ohio-2062, at ¶14:

> The unity of title requirement accords with the principles of implied easements. Implied easements are easements read into a deed. "An implied easement is based upon the theory that whenever one conveys property he includes in the conveyance whatever is necessary for its beneficial use and enjoyment and retains whatever is necessary for the use and enjoyment of the land retained." *Tratt[a]r,* supra, at 291, 95 N.E.2d 685. In other words, implied easements are those easements that a reasonable grantor and grantee would have expected in the conveyance, and a court will read the implied easement into a deed where the elements of that implied easement exist. However, if there is no unity of title, there is no grantor who may give an easement to the grantee. It does not matter whether a reasonable grantor would have conveyed an easement or a reasonable grantee would have expected to receive an easement. A grantor simply cannot convey what is not possessed.

**{¶36}** At trial, Attorney Rhoads testified that he was an experienced lawyer primarily engaged in real estate transactions and that he had conducted an estimated

25,000 to 30,000 title examinations over the course of his career. The Wyckoffs asked him to research the ownership history of the properties in question. He conducted a chain-of-title exam and public record search on all the contested properties. This research, described in significant detail at trial, led him to his opinion that during the approximate three-year period of 1943 through 1946, Calvin Williams commonly possessed the lands currently owned by the Wyckoffs, the Williams Trust, and the Maynards, i.e., the portion of SRR relevant to the implied easement claim. Rhoads additionally testified that Calvin Williams severed this land in 1946, first selling the land now owned by the Maynards and Williams Trust in March 1946 while retaining the land currently possessed by the Wyckoffs.[1] In August 1946, he sold the land currently owned by the Wyckoffs. Attorney Rhoads' testimony is "some" competent and credible evidence supporting the Wyckoffs' burden of proof of clear and convincing evidence of unity of ownership and severance.

### a. Attorney Rhoads' Qualifications

{¶37} However, the defendants challenge Attorney Rhoads qualifications to offer his opinion about which estates Calvin Williams commonly possessed. They point out that he was not a surveyor and was thus unqualified to give such an opinion. The Wyckoffs contend that Attorney Rhoads was qualified to offer his opinion and based it on a chain-of-title exam of all relevant deeds, which included a comparison of the metes-and-bounds descriptions in each deed.

{¶38} A lay witness may provide his opinion if "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid. R. 701. Expert testimony is

---

[1] For purposes of the implied easement, it is at the time of this March 1946 severance that Calvin Williams allegedly failed to record the easement through the Williams and Maynard tracts.

required when an opinion relates to matters beyond the knowledge or experience possessed by laypersons, and among other requirements, the witness is qualified to give his expert opinion based on his or her background and the basis for his opinion is reliable and verifiable. See Evid.R. 702.

{¶39} The Wyckoffs did not expressly ask the court to qualify Rhoads as an expert and thus he apparently testified as a lay witness. Assuming, without deciding, that expert testimony was required to prove this element of an implied easement, the defendants offered no objection to his opinion testimony at trial. A party waives any error that arises during the trial court proceedings if that party fails to bring the error to the court's attention, by objection or otherwise, at a time when the trial court could avoid or correct the error. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 1997-Ohio-401, 679 N.E.2d 1099. A failure to object at trial waives all but plain error on appeal. Id. The plain error doctrine is applicable in civil cases only where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process[.]" Id. at syllabus. Thus, the defendants waived any argument challenging Rhoads' qualifications to give his opinion on common ownership based on a review of the publicly recorded deeds in this case. Moreover, we see nothing in Rhoads' testimony indicating the need to apply the plain error doctrine.

{¶40} After explaining his qualifications, Rhoads testified at length about the process he used to conduct the chain-of-title exam before offering his ultimate opinion. He supported his testimony with reference to written summaries of the relevant deeds, which the court admitted without objection into evidence. Had the defendants objected, we have little doubt the trial court would have found him qualified to offer his opinion on common ownership and severance. Consequently, we are confident that Rhoads'

testimony demonstrates some competent and credible evidence establishing unity of ownership between 1943 and 1946 and severance in 1946 in the lands currently owned by the Wyckoffs, the Williams Trust, and the Maynards.

### b. Common Ownership and *Swayne v. Roof*

**{¶41}** Next, the defendants argue that the Wyckoffs failed to establish severance because Calvin Williams lacked unity of title. The defendants contend that Calvin Williams did not originally obtain the properties as a single master tract, but rather, obtained two or more separate parcels, and then later separately resold those parcels. In essence, the defendants are arguing that no real severance occurred as the parcels retained their original identity as separate even during the period of common ownership.

**{¶42}** In support of their argument, the defendants cite *Swayne v. Roof*, Scioto App. No. 01CA2766, 2001-Ohio-2643, 2001 WL 1682943. There, we held the theory of implied easements was inapplicable because, among other reasons, the facts demonstrated no unity of title. The Wyckoffs argue that the specific holding cited by the defendants in *Swayne* is dicta, but even if it is not, the cases are factually distinguishable.

**{¶43}** *Swayne* involved a dispute over a driveway between two bordering homeowners. Id. at *1. The defendant owned the land upon which the driveway was located but the driveway led back to a garage at the rear of the plaintiffs' property. The defendant later erected a fence on the driveway, blocking the plaintiffs' access to the garage. The plaintiffs claimed that they had always used the driveway to access the garage. They also claimed that the original owner of their home built and used the driveway expressly for this purpose in 1937. Id.

**{¶44}** The plaintiffs sued, asking the court to quiet title in the driveway, under a theory of adverse possession. Id. After both parties moved for summary judgment, the court found that the plaintiffs had established ownership in the driveway by adverse possession. Id. at *2. The court also included language in the judgment entry indicating that the plaintiffs acquired an easement in the disputed driveway, by implication and prescription. The plaintiffs had not sought an easement in their complaint or in their motion for summary judgment. In fact, the plaintiffs apparently raised the issue for the first time in response to the defendant's motion for summary judgment. Id.

**{¶45}** On appeal the defendants argued that the court erred by declaring the plaintiffs owners by adverse possession. Id. at *3. We agreed and reversed, holding that that the evidence did not support a finding that the plaintiffs and their predecessors in title used the driveway for the statutory period of 21 years. Id. at *4.

**{¶46}** We also addressed the defendants separate argument that the trial court erred by granting the plaintiffs an easement when that claim was not an issue properly before the court. In defense of this assignment of error, the plaintiffs argued that Civ.R. 15(B), which provides for the amendment of pleadings to conform to issues "tried by express or implied consent of the parties," permitted the trial court to grant the easement, even though it had not been requested in the complaint or actually litigated in the summary judgment proceedings. We rejected the argument that Civ.R. 15(B) provided a basis for the trial court to issue a ruling not requested in the pleadings because it was not clear that the issue of an implied easement was actually "tried" by the express or implied consent of the defendant. We went on to state that "[e]ven assuming *arguendo* that Civ.R. 15(B) is applicable, we find insufficient evidentiary

materials under Civ.R. 56(C) to support a summary judgment for appellees on [the implied easement issue]."  Id. at *5.  (Emphasis in the original.)

**{¶47}** We then explained that an implied easement requires "unity of ownership" in an estate, and that the facts did not appear to conform to that requirement.  Id. at *6. Specifically, the summary judgment record indicated that a prior owner, Sadie Dials, purchased both homes at different times, and for approximately twenty years, held title to both homes.  We found that these facts did not amount to "unity of ownership" for purposes of implying an easement because the property did not "form a single estate" when it was under common ownership, but rather, "the property consisted of two separate contiguous estates" which just happened to be owned by Sadie Dials.  We also noted that Dials had not purchased the properties as a "master tract" and then imposed a servitude on one portion for the benefit of the other, but in fact, the servitude had been in existence prior to her purchase of the property.  Thus, "the theory that Dials created an implied easement during her tenure of ownership does not apply."  Id.

**{¶48}** Initially, we disagree with the Wyckoffs' argument that the portion of *Swayne* upon which the defendants rely is dicta.  Dicta, also referred to as obiter dictum, translates to "something said in passing."  It is "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." Black's Law Dictionary (9th Ed. 2009).

**{¶49}** A court is not bound to follow its own dicta from a prior case in which the point at issue "was not fully debated." *Cent. Virginia Community College v. Katz* (2006), 546 U.S. 356, 363, 126 S.Ct. 990.  "The problem with dicta, and a good reason that it should not have the force of precedent for later cases, is that when a holding is unnecessary to the outcome of a case, it may be made with less care and thoroughness

than if it were crucial to the outcome." *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, at ¶89 (O'Donnell, J., concurring and dissenting in part), quoting *Bauer v. Garden City* (1987), 163 Mich.App. 562, 571, 414 N.W.2d 891. (Bracketing omitted.)

{¶50} However, "[t]he fact that a decision is based on two grounds does not render it obiter dictum as to one of those grounds. If the question is fairly presented by the record, the decision thereon does not become mere dicta by reason of the fact that there is another proposition on which the decision might have been based." 22 Ohio Jurisprudence 3d., Courts and Judges, Section 381, citing *Richards v. Market Exch. Bank Co.* (1910) 81 Ohio St. 348, 90 N.E. 1000. In *Richards*, the Supreme Court of Ohio explained:

It is said that the *Maryland case-Vanderford, Ex'r, v. Bank*, supra-is not authority as giving construction to the negotiable instruments act, because the necessities of the case did not call for a review of that statute, and hence the holding in that regard is mere dicta. Is it? *** [the holding] was sustained on two grounds * * *[.] Either ground was good, but why is one entitled to more favor than the other? Both presented legitimate points for consideration, and each added to the conclusiveness of the court's judgment. It will be news to many of the older members of the profession if it is the law that the determination of a question fairly presented by the record becomes mere dicta if there happens to be another proposition on which the decision might have been based. If a pertinent proposition can be argued out of a case on the above theory, then it would be necessary

only for another critic to attack the other ground as dicta to reduce to dicta the entire decision.

{¶51} In *Swayne,* this Court offered two separate bases for its holding on the issue of easements. Both bases appeared to be "fully debated," and each presented legitimate points for consideration. Finally, both bases added to the conclusiveness of the judgment issued. Thus, the language cited by the defendants is not dicta. And we must determine what effect *Swayne* has on this case.

{¶52} We agree with the Wyckoffs that *Swayne* presents a factually distinct situation from that at hand. In *Swayne*, Sadie Dials owned two parcels of residential property and each parcel contained a separate house. The evidence in the summary judgment record indicated that Dials believed that the driveway actually belonged to the house with the garage behind it, i.e., the claimed dominant estate. Thus, nothing about the nature of Dial's "common ownership" could arguably support the conclusion that she intended to grant an easement when she sold the plaintiffs' house. Why would she have granted an easement if she did not know or believe that an easement was necessary?

{¶53} In the present case, the evidence established that Calvin Williams, for an approximate period of three years, commonly owned two large tracts of contiguous rural wooded land. Because he owned the land, Calvin Williams also owned the road. SRR was the only route of ingress and egress to these tracts of land in the hollow at that time and well before it. Thus, when Calvin Williams first severed the commonly owned land in March 1946, he would have been aware that he would require the continued use of SRR through the southern tract (the Maynard and Williams Trust lands) to continue to access the northern portion he retained. Therefore, unlike Dials, some evidence in the

record concerning common ownership and severance would support the legal fiction that Calvin Williams, while failing to do so, intended to create an easement through the southern tract.

**{¶54}** In *Swayne,* we also mentioned that Dials did not expressly impose the servitude herself, and that it had been in existence prior to her purchase of the property. The facts here are similar as the evidence demonstrated that SRR was in existence for many years prior to Calvin Williams' common ownership. Thus, one could argue he did not intend to create the servitude because SRR already existed. But this argument overlooks the basic assumption behind the doctrine of implied easements of prior use – that the grantor intends to convey or retain whatever is necessary for the beneficial use of the property. *Hurst v. Baker* (Aug. 22, 2000), Gallia App. No. 99CA14, 2000 WL 1206533, at *2, citing 36 Ohio Jurisprudence 3d (1982) 429 Easements and Licenses, Section 32.

**{¶55}** Whether the grantor actually created the "use" giving rise to the implied easement seems to have little bearing on whether the grantor intended to but failed to retain or convey the use in a subsequent conveyance. Regardless of who built it, Calvin Williams certainly had to be aware that SRR provided the only access road to his property. And it is the common owner's awareness of the need to retain or grant the use for the enjoyment of himself or the dominant owner that most clearly and logically supports the legal fiction that he intended to but failed to record an easement.

**{¶56}** Although we cannot distinguish *Swayne* on this point, we have implied in other cases before this Court that the common owner need not have created the servitude himself. See, e.g., *Jones v. Bethel* (1925), 20 Ohio App. 442, 444-45, 152 N.E. 734 (commenting that the common owner may or may not have constructed the

private way at issue); *Hurst*, supra, at *2 (noting that roadway in question was a permanent fixture at the time of the original deeds, indicating its existence before common ownership).

**{¶57}** Consequently, we conclude that Attorney Rhoads' testimony, establishing that Calvin Williams commonly owned the lands currently possessed by the Maynard, Williams Trust, and Wyckoffs, and then later severed that land while retaining the northern dominant portion provides some competent and credible evidence indicating common ownership and severance for purposes of an implied easement.

2.  Continued and Obvious Use

**{¶58}** The defendants next contend that the Wyckoffs failed to set forth evidence of continued and obvious use of SRR as an access road prior to severance.  This element required the Wyckoffs to prove by clear and convincing evidence that before severance, the use giving rise to the implied easement was "so long continued and obvious or manifest as to show that it was meant to be permanent[.]"  *Ciski* at syllabus. Here, we focus on evidence of the easement's permanence, by looking not only at continuity of use, but also examining whether the use was "apparent."  *Baker v. Rice* (1897), 56 Ohio St. 463, 47 N.E. 653, at syllabus.  For a use to be apparent, it must be "plainly visible."  *Campbell v. Great Miami Aerie No. 2309, Fraternal Order of Eagles* (1984), 15 Ohio St.3d 79, 81, 472 N.E.2d 711 (per curiam).  "[F]or a use to be permanent in character * * * a mere temporary provision or arrangement made for the convenience of the entire estate will not constitute that degree of permanency required to burden the property with a continuance of the same when divided or separated by conveyance to different parties."  *Trattar* at 292.

**{¶59}** Stanley McNelly testified about traveling SRR in or around 1930, and he stated he used SRR to access the hollow "many a time." He testified that "everybody" used SRR to go hunting in the hollow.

**{¶60}** McNelly recalled doing plow work for Calvin Williams. He stated that he witnessed Calvin Williams take a team of horses on SRR. He recalled traveling SRR to visit some of the individuals who lived in the two houses located in the hollow. Cathy Miller lived in both houses of the hollow and remembered seeing Calvin Williams on SRR. She recalled playing with the Wyckoffs as a child and remembered seeing them on SRR.

**{¶61}** In one recent case, a court also found evidence of permanency in a plat map, showing an access road near the subdivision lots to which it ran adjacent. *Cadwallader v. Scovanner*, 178 Ohio App.3d 26, 2008-Ohio-4166, 896 N.E.2d 748, at ¶27. In this regard, Purdom testified concerning a 1947 Pike County Engineer's Office Map that depicted township highways. He noted it contained a double dotted line that seemed to conform to the survey he conducted of SRR. Purdom also discussed a 1917 United States Geological Survey map, which contained a double line – indicating an unimproved road – in the same approximate area as SRR. The existence of SRR on survey maps dating back as far as 1917 offers some competent and credible evidence of permanency. Consequently, we hold that the record contains some competent and credible evidence of permanency prior to severance.

3. Reasonable Necessity

**{¶62}** The defendants argue that the Wyckoffs failed to establish that the use of SRR was "reasonably necessary" to their enjoyment of the hollow. Here, the Wyckoffs had the burden of proof of putting forth clear and convincing evidence that the implied

easement was "reasonably necessary to the beneficial enjoyment of the land granted or retained[.]" *Ciski* at syllabus. In *Jones v. Bethel* (1925), 20 Ohio App. 442, 152 N.E. 734, we held that "[t]he question of whether a roadway is reasonably necessary to the enjoyment of premises conveyed is one that must be determined from the conditions existing at the time of the conveyances." Id. at 446, quoting *Jordan v. Breece Mfg. Co.* (1914), 89 Ohio St. 311, 106 N.E. 46, at paragraph two of the syllabus. Additionally, the necessity must exist at the time of the conveyance, "and no facts developing later affect it." Id., citing 2 Tiffany on Real Property (2d Ed.), p. 1303. In *Jones,* we also discussed *Baker v. Rice*, supra, in which the Court held that the proposed implied easement, in addition to facilitating the "enjoyment" of the land, also "materially adds to its value." Id. at 448.

{¶63} Purdom's testimony established that the portion of the Wyckoffs' property abutting Rob Beekman Hill Road is some 400 to 500 feet in elevation above the base of the hollow. When one descended from Rob Beekman Hill Road to the level areas of the hollow, one would encounter difficult terrain graded at slopes ranging from 20% to 35%. Purdom opined that building an access road from Rob Beekman Hill Road would be an "expensive proposition if you were to grade it" at 12% to 14%, which is the maximum grade for a public township road.

{¶64} Other witnesses testifying for the Wyckoffs' indicated the degree of difficulty one encounters if accessing the property from Rob Beekman Hill Road. Kenny Gragg testified that he drove a four-wheeler down the power line right of way after the Ransom blockade but swore he would not do that again because of the difficult descent. Shane Gragg described the hill coming down the right of way as "straight up and down." Terry Williams testified that the hill coming off Rob Beekman Hill Road was "very steep,"

and that the "easy way" to access the right of way was via SRR.  He testified that he could get his work trucks to the right of way, but it would require him to bulldoze a road.

{¶65}  David Wyckoff said that SRR was necessary so that he could move tools, water, and other supplies to the hollow to perform land maintenance.  Gary Wyckoff testified that he did not believe he could run an economical timbering operation in the area if he had to move equipment down from the Rob Beekman Hill Road access point.  He also questioned how one would maintain a road located in an area sloped with a 20% to 35% grade.

{¶66}  The Wyckoffs' witnesses and evidence presented some competent and credible evidence that the use of SRR was reasonably necessary for the beneficial use and enjoyment of the hollow.  It is undisputed that the slope coming off Rob Beekman Hill Road is very steep, and that, although it would be possible to create an access road at Rob Beekman Hill Road, it could be difficult to maintain and expensive to build.  Thus, SRR adds "materially" to the value of the Wyckoffs' land.  And although the focus of whether a servitude is reasonably necessary must be determined at the time of severance in March 1946, the record would lead to the natural inference that the use of SRR to access the Wyckoffs' land was just as necessary in 1946 as it was during the period of the Wyckoffs' ownership.

{¶67}  The defendants argue, however, that the Wyckoffs failed to establish this element because their "only interest" in using SRR is to exploit the natural resources of the hollow and run a timbering operation.  The defendants point out that they submitted the testimony of a professional logger who indicated he could easily create a road from the portion of Rob Beekman Hill Road touching the Wyckoffs property; but the Wyckoffs

provided no testimony from an "experienced logger" that using SRR was a cost effective choice.

**{¶68}** Ronnie West, the defendants' expert logger witness, testified that he had built roads in similar situations with success. He stated that he could build a road, using culverts, to access the Wyckoffs' property. He additionally explained that he built roads in places "ten times worse" than what he observed at the Rob Beekman Hill Road access point. But when asked if he would rather use SRR or create an access point at Rob Beekman Hill Road, he said he would rather access through Rob Beekman Hill Road in order to "stay out of everyone's hair."

**{¶69}** West's testimony merely supports the conclusion that it would be possible to create an access road to the Wyckoffs' land from Rob Beekman Hill. An easement implied from prior use does not require a showing of strict necessity, merely, that the use is reasonably necessary. See *Metro. Home Invest. Corp. v. Ivy Hill Condominium Assn.* (Dec. 4, 1998), Trumbull App. Nos. 97-T-0030, 97-T-0143, 1998 WL 964591 (discussing the differing legal standards in demonstrating necessity for easements implied by prior use and easements by necessity). Thus, West's testimony does not negate the competent and credible evidence in the record indicating that the use of SRR was reasonably necessary for the enjoyment of the hollow and materially added to its value at the time of severance. Consequently, we conclude that the record contains some competent and credible evidence establishing clear and convincing evidence that the use of SRR was reasonably necessary for ingress and egress to the hollow.

### 4. Continuous as Opposed to Occasional Use

{¶70} Finally, the defendants contend that the Wyckoffs failed to meet their burden of clear and convincing evidence of continuous use. This element requires the claimants to demonstrate that the implied servitude is "continuous as distinguished from a temporary or occasional use[.]" *Ciski* at syllabus. Like all elements of an easement implied from existing use, whether the use of the servitude was continuous as opposed to occasional requires an examination of the facts and circumstances occurring during and before the period of the common owner. See, generally, id. at 495.

{¶71} After reviewing the record, we find that it contains some competent and credible evidence indicating continuous as opposed to occasional use during Calvin Williams' period of common ownership. Stanley McNelly testified that he drove his car on SRR to hunt with Chet Williams, who lived in one of the houses located in the hollow. This occurred in approximately 1940. But McNelly testified that he had been in the hollow "many a time" after 1940, which could reasonably indicate that he visited the hollow, using SRR, during the period of Calvin Williams' common ownership. Bolstering this assumption, McNelly testified that he plowed fields in the hollow for Calvin Williams. He also recalled seeing Calvin Williams take a team of horses on SRR. McNelly, who was 87 years old at the time he testified, unsurprisingly, did not provide exact dates or years for the events he witnessed. However, the trial judge sitting as factfinder in this case could reasonably infer that at least some of the use witnessed by McNelly occurred in the period of common ownership.

{¶72} No evidence indicated that Calvin Williams lived in the hollow. But some evidence suggested that he rented houses in the hollow to various families, including Chet Williams, Cathy Miller's father. Cathy Miller was the only other witness for the Wyckoffs who could testify as to use in the period nearly seventy years ago when Calvin

Williams owned the property. She lived in both houses located in the hollow beginning in or around 1943 when she was three years old. She lived in the hollow through the period of Calvin Williams' common ownership, and moved out in the middle of the sixth grade, around 1950, approximately. SRR was the only means of ingress and egress from the area she lived. Miller testified about some other individuals who lived in the hollow at that time, including her grandfather, Albert Williams, who lived in the second house in the hollow. She was not sure if her father rented from Calvin Williams, but she recalled that Williams would "come in once in a while."

{¶73} Consequently, the record contains some evidence supporting the trial court's finding that Calvin Williams, and those living in the hollow made continuous use of SRR in order to access it for residential purposes and for plowing fields. Admittedly, there was not an abundance of evidence in this regard. The trial court had to infer many dates from witnesses who testified about events occurring seven decades prior. However, this is not surprising given the time that had passed since Calvin Williams' common ownership.

{¶74} In sum, the record contains "some" competent and credible evidence in support of the trial court's finding that the Wyckoffs' met their burden of proving an easement implied from prior use over the Williams and Maynards tract by clear and convincing evidence. We therefore reject this assignment of error.

C. The Prescriptive Easement over the Beekman Tract

{¶75} In their second assignment of error, the defendants argue that the trial court erred in its finding that the Wyckoffs acquired an easement by prescription over the portion of SRR that crosses Richard Beekman's tract. The defendants contend that the weight of the evidence fails to support the trial court's award.

**{¶76}** "Prescription is the acquisition of an easement, over the property of another, through adverse use of that property." *Crawford v. Matthews* (Sept. 21, 1998), Scioto App. No. 97CA2555, 1998 WL 720734 at *2.[2] "Prescriptive easements are not favored in law, because they deprive the legal property owner of rights without compensation." *Fitzpatrick,* at ¶25, citing *Cadwallader*, supra, at ¶55. "Thus, '[o]ne who claims an easement by prescription has the burden of proving by clear and convincing evidence all the elements essential to the establishment thereof.'" Id. at ¶26, quoting *McInnish v. Sibit* (1953), 114 Ohio App. 490, 183 N.E.2d 237, at syllabus.

**{¶77}** A court may create a prescriptive easement in favor of one who uses the land of another for the statutory period of 21 years. Curry at Section 15.02[2], 15-10; see, also, R.C. 2305.04. The required elements of a prescriptive easement are similar to those in the law of adverse possession. Curry at id. The person seeking the easement must demonstrate clear and convincing evidence of open, notorious, adverse, and continuous use of the easement for a 21-year period. Id.; *Crawford* at *2. "If the claimant makes a prima facie case, then the burden shifts to the owner of the servient property to show that the use was permissive." *EAC Properties, L.L.C. v. Hall*, Franklin App. No. 08AP-251, 2008-Ohio-6224, at ¶7, citing *Goldberger v. Bexley Properties* (1983), 5 Ohio St.3d 82, 84, 448 N.E.2d 1380 (per curiam); *Pavey v. Vance* (1897), 56 Ohio St. 162, 46 N.E. 898. Evidence that the use was permissive will defeat a claim of a prescriptive easement. Curry at Section 7.09[1], 7-28.

1.  Open and Notorious Use

---

[2] In *Crawford* we noted, "[p]rescription is, in essence, a form of adverse possession. They differ in that prescription grants the adverse user an easement or incorporeal rights in the property, while adverse possession grants the adverse user legal title." Id. at fn.6.

{¶78} The defendants argue that the Wyckoffs failed to meet their burden of clear and convincing evidence of open use of SRR. "Open" and "notorious" use requires that the actual use be of a character that is capable of giving the legal owner notice. *Crawford* at *3. The law requires notice of this sort so that the true owner has the ability to protect him or herself during the statutory period by preventing the use. Id., citing *Jennewine v. Heinig* (Dec. 29, 1995), Greene App. No. 95CA12, 1995 WL 766005. "Property is used 'openly' when it is used 'without attempted concealment,' and it is used 'notoriously' when its use is 'known to some who might reasonably be expected to communicate their knowledge to the owner if he maintained a reasonable degree of supervision over his premises.'" Id., quoting *Hindall v. Martinez* (1990), 69 Ohio App.3d 580, 584, 591 N.E.2d 308. An "invisible" use or occasional trespass would not reach the level of open and notorious use, e.g., mere sporadic hunting on the land of another was insufficient to put the true owner on notice of a trespass. *Cochran v. Cochran*, Jackson App. No. 03CA17, 2003-Ohio-6944, at ¶22.

{¶79} Our review of the trial record revealed some competent and credible evidence establishing "open" and "notorious" use of SRR by the Wyckoffs and their family members for the prescriptive period of 1980 through 2001. Gary Wyckoff testified that he used SRR and never tried to "hide and seek." He said he would wave or talk to Richard Beekman as he walked by. David Wyckoff also testified that he would wave and talk to Richard Beekman when he would travel SRR. Shane Gragg testified that as he traveled SRR, he would see and wave at the defendants, generally. Jade Isaacs, David Wyckoff's granddaughter, testified that she would use SRR in the 1990s, typically twice a year, and would travel it by four-wheeler. She also claimed that her "entire

family" would travel SRR. Jade Isaacs further testified the defendants would have heard the four-wheelers passing by.

{¶80} Shane Gragg, Charlie Wyckoff's grandson, began using SRR in 1984 and recalled traveling it to go hunting with his grandfather. He continued to use SRR to access the hollow for hunting after his grandfather died. From 1991 through 1994, he hunted the hollow "a lot" with his high school friends. He recalled seeing some of the defendants when he would travel SRR and indicated that he would wave at them.

{¶81} Gary Wyckoff testified that, during the prescriptive period of 1980 through 2001, his children and grandchildren used SRR to access the hollow, typically on foot. He claimed using SRR to access the hollow after 1987. He recalled taking his mother Etta to the hollow in 1992 to obtain grapevines for making wreaths. He stated that his use of SRR was open and said he never tried to conceal himself as he went up the access road.

{¶82} Jason Wyckoff, son of David Wyckoff, testified that he used SRR at least once a year during the prescriptive period and that he would pass "people" and wave at them.

{¶83} Finally, the sworn of affidavit of John Beekman stated that the Wyckoffs openly crossed the portion of SRR crossing his property for more than 21 years prior to the road blockade. Because John Beekman's property is adjacent to and north of his brother's property, this evidence could lead the factfinder to the natural assumption that if the Wyckoffs and their family members openly crossed the portion of SRR crossing John Beekman's property, they did the same with regard to Richard Beekman's property.

{¶84}  As noted in the summary of the defendants' evidence, there is some evidence to support the defendants' version of events, i.e., Ransom and Beekman's testimony that they rarely or never saw anyone cross SRR.  But our focus is not to choose which of the two versions is more credible.  That role belongs to the trial court.  Our job is simply to determine whether some competent credible evidence supports the trial court's choice.

{¶85}  Thus, we find the evidence presented by the Wyckoffs and their witnesses provided some competent and credible evidence of open and notorious use of the portion of SRR that crosses Richard Beekman's property by the plaintiffs and their family members during the prescriptive period of 1980-2001.[3]

{¶86}  The defendants, however, contend that the Wyckoffs' "claims of occasional use of the roadway for horseback, leisurely walks, 4-wheeler rides and hunting are not clear and convincing evidence of actual possession of a character capable of putting the legal owner on notice of the [intent to] possess."  The defendants further argue that the Wyckoffs did not establish the "open use" element as their evidence only indicated that their children and grandchildren, who did not own the land, used SRR.  Therefore, the defendants contend that an owner of property "cannot claim to establish an easement by prescription through the acts of others not in privity of title."

{¶87}  First, to prove that the *use* was "open," it is unnecessary that the prescriptive claimants engage in acts necessary to convey to the true owner the intent to "possess."  That is the case if the Wyckoffs were attempting to establish ownership

---

[3] We note in their brief, the defendants argue that "Richard Beekman blocked [SRR] with a bus and a pile of firewood from 1979 to 1984, making passage impossible."  In their brief, the Wyckoffs contend that there was no evidence of this alleged blockage in the trial record. Our review of the trial record also revealed no testimony of a roadblock occurring during that period.  In their reply brief, the defendants apparently admit that there is no evidence in the trial record of this occurrence. However, "both parties [sic] post-trial briefs referenced this alleged road block."  As there was no evidence in this regard adduced at trial, we do not consider it.

through the doctrine of adverse possession.  But here, the question is whether the Wyckoffs' use of the portion of SRR that crosses Richard Beekman's property was of a nature that could reasonably indicate to Beekman that they were *using* it adversely, not that they were attempting to possess it as their own.

{¶88}  Second, we are unaware of authority precluding a plaintiff from demonstrating prescriptive use of an easement through the acts of family members with their direct or implicit permission, such as the Wyckoffs' children or grandchildren.  The defendants cite *Dietrick v. Noel* (1884), 42 Ohio St. 18 and *Burchfield v. Wolfe*, Hocking App. No. 00CA11, 2001-Ohio-2552 in support of this argument, however, no portion of either case stands for that proposition.

{¶89}   Use by the Wyckoffs directly or by their family members serve the same general purpose of the requirement of open and notorious use, i.e., placing the true property owner on notice of adverse use.  And the cases we have reviewed support the conclusion that evidence of familial use is sufficient to establish open use.  See, e.g., *Korenko v. Kelleys Island Park Dev. Co.*, Erie App. No. E-09-020, 2010-Ohio-572 ("[t]hese *families* * * * engaged in numerous uses of the parcel for over three decades that were clearly open, notorious, continuous and adverse." Id. at ¶27. (Emphasis added.)); *Rice v. Taylor,* Champaign App. No. 2001 CA 30, 2002-Ohio-3493, 2002 WL 1438671 ("there is a dearth of evidence that the use by Rice and his *family* of the driveway was ever hostile or adverse[.]" Id. at *3. (Emphasis added.)); *McConachie v. Meeks*, Richland App. No. 98CA90, 1999 WL 976421 ("[n]or was such use plainly visible to appellees as is evidenced by the fact that Ritter had never seen appellant or his *family* on the land." Id. at *3. (Emphasis added.))

**{¶90}** In this case, the Wyckoffs and various members of their family testified that they openly used the portion of SRR passing through Richard Beekman's property to ingress and egress the hollow. We see little significance in whether the Wyckoffs put forth evidence of open use through their own acts or by evidence of open use by their immediate or extended family members. If the Wyckoffs or their family members did not conceal their use, nothing would prevent Richard Beekman from recognizing it and stopping it.

2. Adverse or Hostile Use

**{¶91}** Next, the defendants claim that the Wyckoffs failed to meet their burden of clear and convincing evidence that their use of SRR was "adverse" or "hostile" during the prescriptive period of 1980-2001. Use of a claimed prescriptive easement is "adverse" when it is without the permission of, or inconsistent with the rights of the true property owner. *Crawford* at *3. Adversity or hostility does not require there to be a heated dispute between the legal owner and prescriptive claimant. Curry at 7.02[3], 7-9. Rather, "the hostility requirement simply mandates that the use be opposed to the legal interests of the legal owner." Id. Use is never adverse when it occurs by the express or implied permission of the true owner. Id. at Section 7.02[3], 7-11. And whether a use is adverse or permissive depends on the circumstances of each particular case. *Crawford* at *3. "Where one uses a way over the land of another without permission as a way incident to his own land, and continues to do so with the knowledge of the owner, such use is, of itself, adverse, and evidence of a claim of right[.]" *Pavey*, supra, at paragraph one of the syllabus.

**{¶92}** The record contains some competent and credible evidence establishing hostile or adverse use. Some of the Wyckoffs that testified directly stated and others

strongly implied that their use of SRR was without anyone's permission.  Gary Wyckoff stated, "I've never really asked anybody to go up.  I guess it's an assumption that we had, and so I've never asked anybody for permission to go up the uh, road."  Thelma Dunn testified that she "never" asked permission from anyone to use SRR.  David Wyckoff testified that he did not seek anyone's permission to have Wooldridge timber the land; he also implied in other testimony that he would not have asked for permission to travel SRR himself.  When asked if he would have asked permission for Wooldridge to use SRR, he responded in the negative, stating, "[t]hat was just an understood. * * * That's the way you went in there.  You know, I . . . You just wouldn't ask somebody for permission to[.]"  Jason Wyckoff, son of David Wyckoff, testified that he never asked permission of anyone to use SRR and that he used it at least once a year.

{¶93}  Thus, some competent and credible evidence in the record demonstrates that the Wyckoffs use of SRR was without permission and therefore adverse.  Having established a prima facie case on this element, the burden shifted to the defendants to prove permissive use.  See *Pavey*, supra.

{¶94}  The defendants argue that they demonstrated the Wyckoffs' permissive use because Rick Wooldridge, the individual whom they contracted to haul timber, sought and received permission from Richard Beekman to use the portion of SRR crossing his land.  The defendants also contend, "Plaintiff David Wyckoff testified that he expressly understood that his use of the roadway was with Richard Beekman's permission (Transcript 352)."

{¶95}  We are not convinced that Rick Wooldridge's request and receipt of permission to cross Richard Beekman's road for his timbering operation defeats adversity.  Wooldridge testified that he asked Robert Williams, John Beekman, and

Richard Beekman for permission to drive his trucks over their property to haul timber. And Wooldridge testified that he asked Richard if he could trim back a tree branch on SRR and promised Richard that upon completion of the timbering job, he would lay gravel on the portion of SRR crossing his property.

{¶96} While it is undisputed that Wooldridge asked permission of the defendants, he did not testify that he did so at the Wyckoffs' request. Thelma Dunn testified that she contracted Wooldridge to timber the land. She also stated that she did not ask for anyone's permission so that he could use SRR to haul the timber. David Wyckoff also indicated in the testimony mentioned above that he did not tell Wooldridge to obtain permission. And there was no other evidence in the record indicating that the Wyckoffs' instructed Wooldridge to obtain permission from the defendants before using SRR. The evidence indicates that Wooldridge took it upon himself to obtain permission.

{¶97} Also contrary to the defendants' assertion, David Wyckoff did not testify that he "expressly" understood that his use of SRR was with Richard Beekman's permission. On cross-examination, defense counsel asked David Wyckoff if, when he traveled SRR and passed Richard Beekman's house, whether he would wave or engage him in some brief conversation. David confirmed that he would. David also told defense counsel that Richard Beekman never told him he could not use the road. Then defense counsel asked if "it was your impression or your understanding that it was okay with Richard to walk along that road in front of his house?" David responded "Absolutely *** I have no reason to think anything different." We do not agree that this testimony establishes that David Wyckoff understood his use of the portion of SRR crossing Richard Beekman's road was permissive. Instead, it indicates to us that David Wyckoff never recognized that he needed to obtain permission from Richard Beekman

to use SRR.  Stated otherwise, David Wyckoff never sought Richard Beekman's permission to use SRR because he had no reason to believe he needed it.

{¶98}  Thus, our review of the record demonstrates some competent and credible evidence of adverse or hostile use of the portion of SRR crossing Richard Beekman's land.  The Wyckoffs' and their witnesses' testimony reveals that they openly used the roadway and did not seek, nor believe that they needed permission to cross it.

### 3. Continuous Use

{¶99}  Finally, the defendants argue that the Wyckoffs failed to meet their burden of proving continuous adverse use for the 21-year prescriptive period.  This element required the Wyckoffs to establish, by clear and convincing evidence, use that is "neither interrupted by acts of the owner nor abandoned by the adverse user" throughout the 21-year statute of limitations.  *Crawford* at *3; Curry at Section 7.02[5], 7-13.  The acts of the prescriptive claimant "do not need to be daily or constant; rather, occasional use that will 'fairly indicate an uninterrupted use' to the true owner will suffice." Curry at id. See, also, *Keish v. Russell* (Feb. 17, 1995), Athens App. No. 94CA1618, 1995 WL 75388 ("[t]here is authority that occasional use can be the basis of a prescriptive easement." Id. at *2, citing *Kunkel v. Ulm* (1930), 9 Ohio Laws Abs. 232, 233; *Jeffers v. Jeffers* (Mar. 14, 1986), Lucas App. No. L-85-206, 1986 WL 3247).  Abandonment of the use of the easement may destroy the necessary continuity, but temporary and reasonable breaks in the possession do not have that effect.  Id. at Section 7.02[5], 7-14.  However, the use must be so "continuous" as to fairly indicate an uninterrupted use.  *Crawford* at id.

{¶100}  The evidence at trial revealed that Jason Wyckoff used SRR at least once a year every year beginning in 1975 or 1976, thus, before the start of the prescriptive

period. Jade Isaacs travelled SRR twice a year in the 1990's to access the family property. Kenny Gragg began using SRR "often" in 1971 and testified that he and Charlie Wyckoff used it to access the property for hunting from 1981 through 1986. From 1996 through 1998, Gragg and his wife used SRR to access the hollow for blackberry picking. Wooldridge, at the Wyckoffs' direction, used SRR for ingress and egress for a timbering operation in 1988. Shane Gragg began using SRR in 1984 with Charlie Wyckoff for hunting, and travelled it to go hunting with friends from high school from 1991 through 1994. David Wyckoff traveled SRR for many years prior to the prescriptive period but testified that he used SRR after 1987 for hunting and gathering honey. Thelma Dunn used SRR from 1985 through 1988 for four-wheeling and riding horses. Since 1988, Dunn walked up SRR at least once a year. She testified that Nancy Gragg and Nancy's children "used SRR all the time." Gary Wyckoff testified that his children and grandchildren would walk up SRR during the prescriptive period. He used SRR to access the hollow after 1987. In 1992, he and Etta Wyckoff used SRR to look for grapevines in the hollow.

{¶101} Based on the foregoing, we find that the record contains some competent and credible evidence of use sufficient to indicate uninterrupted use of SRR from 1980 through 2001 by the Wyckoffs, their predecessors in interest, and their families. Although this use was occasional, it was in keeping with the nature of the uses made of the Wyckoffs' land, i.e., seasonal use for recreation and infrequent timbering.

{¶102} The defendants, however, argue that the Wyckoffs used SRR once to haul timber, and that "the single use as a log road during a twenty-one year period cannot reasonably be said to be continuous." The defendants also point to the testimony of Richard Beekman and George Ransom who said that they rarely saw the Wyckoffs

using the roadway.  And the defendants cite *Vance v. Roa* (Sept. 7, 2000), Lawrence App. No. 99CA23, 2000 WL 1283075, for an example of a similar situation in which we held that the use was not sufficiently continuous.

{¶103}  *Vance* involved a claim for a prescriptive easement over a private roadway, similar to this case.  Procedurally, however, *Vance* came to us on an appeal from summary judgment, thus we employed a different standard of review than the case at bar.  There, we stated that "[t]he general rule, of course, is that the infrequent or occasional use of a thoroughfare over property is inadequate to demonstrate 'continuous' use for purposes of establishing a prescriptive easement.  *Scrivner v. Lore* (Apr. 22, 1999), Scioto App. No. 98CA2568, 1999 WL 253551[.]" Id. at *4.  We noted that the easement claimants "could not definitively state how often they used the road but it would appear from their testimony that it was very infrequent at best."  One claimant roughly estimated that the road was used "maybe every other week" and another thought it might have been used "once a month or so." Id.

{¶104}  Unlike *Vance,* the Wyckoffs did not provide rough estimates regarding their use of the SRR.  Rather, each family member stated that his or her use occurred regularly, at least on an annual basis.  They were definitive as to their yearly – and sometimes more than yearly – use of SRR to access the hollow.

{¶105}  *Scrivner*, the case cited for the "general" rule proposed in *Vance* also involved a prescriptive easement over a roadway.  There, Scrivner purchased a large plot of rural land in 1995, which he intended to use as an "investment" or to lease to someone for "horse and cow." Id. at *1.  Scrivner believed that the property's boundary lines extended to a nearby public roadway, although a survey revealed that the property did not border the roadway.  Initially, this was not an issue because an existing access

road known as "Penn Ridge Road" led from the Scrivner plot to the roadway. Like our case, this access road led through the defendant's property as well as the property of few other landowners before connecting with the public road. Scrivner used the access road for a month until the defendant closed off the portion of the road that ran through his property. Id.

{¶106} Scrivner sued for a prescriptive easement and at trial submitted evidence of use of the roadways by other predecessors in title. The previous owner testified that he had been back to the property once while he owned it. However, prior to his ownership, he used the access road two or three times over a period of 15 to 20 years. This was, apparently, the only testimony concerning use of Penn Ridge Road by a predecessor in interest. Scrivner also produced testimony from others who lived in the area -- apparently not record owners -- that had occasionally used the roadway over the prior seventy years. Id.

{¶107} At the conclusion of the trial, the court sustained the defendant's motion for dismissal. Id. at *2. We affirmed, noting that Scrivner's evidence fell short of "clear and convincing" evidence of continuous use. Id. at *3. We noted that "[t]he most which can be said of the evidence adduced below is that *some person, or persons*, made sporadic use of Penn Ridge Road on different occasions over the last seventy (70) years." Id. (Emphasis added.)

{¶108} We noted that the general rule in Ohio is that occasional or infrequent use is insufficient for purposes of establishing continuity in a prescriptive easement claim. But we also observed that "Ohio law seems to relax this standard somewhat, and does not require a showing of daily or even weekly use[,]" just that travel be "so continuous

as to fairly indicate uninterrupted use."   We concluded that Scrivner's evidence was not even minimally sufficient to meet this low threshold.   Id.

{¶109}   Unlike *Scrivner*, the evidence here shows more than sporadic use by "some persons."   The Wyckoffs and their family (i.e., not "some persons") testified about their regular use of the property during the prescriptive period.   Although the individual use was not daily, weekly, or even monthly, the combined family use was sufficiently continuous to indicate uninterrupted use.

{¶110}   Because the record contains some competent and credible evidence going to each element of the Wyckoffs' claim for a prescriptive easement, the defendants' second assignment of error is meritless.

### IV.  Trial Court's Failure to Define Easement in Judgment Entry

{¶111}   In their final assignment of error, the defendants claim that the trial court erred by not "defining" the implied or prescriptive easements it found over the defendants' respective lands.   We agree.   The trial court found that the Wyckoffs acquired both implied and prescriptive easements.   It further ordered an injunction preventing the defendants from "blocking the easement part or interfering with Plaintiffs' use of the easement part and from interfering with plaintiffs' exercise of the rights that follow from having the easements."

{¶112}   In *Adkins v. Boetcher*, Ross App. No. 08CA3060, 2010-Ohio-554, at ¶43, we recently described the need for the specificity in fashioning injunctive relief and the Civil Rule of Procedure that requires it:

> Civ.R. 65(D) provides that "[e]very order granting an injunction * * * shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or

other document, the act or acts sought to be restrained * * * [.]" The Supreme Court of Ohio has held that to satisfy the rule's "form and scope" requirements, an injunction must be sufficiently specific that "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho* (1990), 52 Ohio St.3d 56, 60, 556 N.E.2d 157, quoting 11 Wright & Miller, Federal Practice and Procedure (1973) 536-537, Section 2955. The key concept is that the order should provide the parties with adequate notice of what is expected. However, this Court had held that "specificity, not perfection, is required by Civ.R. 65(D). Only sufficient detail as to advise the defendants of the conduct which they are prohibited from engaging in is required. It is not necessary that every conceivable situation be covered in minute detail." *Mead Corp. v. Lane* (1988), 54 Ohio App.3d 59, 67, 560 N.E.2d 1319. But the injunction must be specific enough to permit the defendant to comply without fear of committing an unwilling violation and it must allow the plaintiff to monitor compliance and seek enforcement for violations.

{¶113} The trial court's order failed to define in any respect the nature or width of the implied and prescriptive easements, or what "rights" the Wyckoffs or defendants had with respect to the easements. The lack of specificity in the trial court's order failed to provide either the Wyckoffs or the defendants with adequate notice of the nature of the easements obtained or provide either party with sufficient knowledge to know what to do or avoid doing to remain in compliance. We therefore remand this case to the trial court

for the limited purpose of defining the nature and rights of the implied and prescriptive easements found in this case and for a judgment entry that clearly defines those rights.

## V. Conclusion

**{¶114}** The record contains some competent and credible evidence supporting the trial court's finding of an implied and prescriptive easement over the respective lands of the defendants. But the trial court failed to define the easements, which it was required to do under Civ.R. 65(D). Therefore, we remand this matter to the trial court for that purpose.

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART, AND
CAUSE REMANDED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED. Appellants and Appellees shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pike County Court of Common Pleas to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

Abele, J. & Kline, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
William H. Harsha, Presiding Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**